IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 2:17-cr-1185-DCN |
| vs. | ) |
| | ) **ORDER** |
| MARK GRAYON, | ) |
| | ) |
| Defendant. | ) |
| | ) |

The following matter is before the court on defendant Mark Grayon's ("Grayon") motion to suppress, ECF No. 81. For the reasons set forth below, the court denies the motion.

## I. BACKGROUND

On September 29, 2017 around 8:00 a.m., Detective Jessica Carpenter received a tip from a confidential informant ("CI") that Grayon was currently travelling to Dorchester County with narcotics on his person. ECF No. 98, Tr. 9:1–5. Detective Carpenter works for the Dorchester County Sheriff's Office ("DCSO") in the narcotics unit. Tr. 7:11–17. Upon receiving this tip, Detective Carpenter contacted other officers in her unit, and they began conducting surveillance of the area where Grayon was expected to be, according to the CI . Tr. 9:6–11. There were four units in addition to Detective Carpenter, including Lieutenant Thompson, Sergeant Allen, Detective Turbeville, and Detective Canfield. Tr. 27:16–22; 31:11–13. These units were in unmarked vehicles. Tr. 16:23–25.

Detective Carpenter picked up the CI and began monitoring conversations between the CI and Grayon. Tr. 9:14–23. Specifically, she observed several text messages and overheard a portion of a phone call. Detective Carpenter explained that the

1

CI and Grayon had previously arranged to meet at a Goodwill store on Trolley Road in Summerville, South Carolina so that Grayon could sell narcotics to the CI. Tr. 10:16–19; 11:25–12:3; 44:11–45:6. Detective Carpenter and the CI drove to the Goodwill and began surveilling the area. Tr. 13:6–14; 44:11–45:6. Detective Carpenter observed Grayon and another male, later identified as co-defendant Rodney Cabrera ("Cabrera"), getting dropped off in the Goodwill parking lot by a female driving a sedan. Tr. 13:16–21. Detective Carpenter was able to identify Grayon based on photographs of Grayon that the CI had given her and the CI's positive identification of Grayon. Tr. 13:22–14:3. Grayon and Cabrera then entered the Goodwill store. Tr. 14:6–9.

Detective Carpenter subsequently observed Grayon leave the Goodwill store and walk towards a nearby apartment complex. Tr. 14:7–9. While Grayon was in the apartment complex, he called the CI several times, but the CI did not answer the phone. Tr. 15:5–12. Grayon remained in the apartment complex for "no more than 20 minutes" and then left the complex. Tr. 15:15–21. Detective Carpenter observed that Grayon had changed clothes, but it is unknown what Grayon did while he was in the apartment complex because there were no surveillance units in the complex. Tr. 30:4–13. Grayon was picked up near the apartment complex by a gray sedan driven by a second female, later identified as Anna Shafer ("Shafer"). Tr. 15:15–16:13. Cabrera was in the car as well. As the car left the complex, Detective Carpenter did not follow it in order to protect the safety of the CI and to prevent the occupants of the car becoming suspicious that they were being followed. Tr. 16:14–19.

Detective Adam Canfield, a narcotics detective who was part of the surveillance team, next saw the car in the Summerville Galleria parking lot, Tr. 48:1–4, which was

about half a mile away from the Goodwill parking lot, Government's Exhibit 1. Detective Canfield was advised by other detectives that the car's occupants had gotten out of the car and were inside a Subway restaurant in the shopping center. Tr. 48:14–16. Detective Canfield could not see them while they were in the Subway, but he observed them leave the restaurant and get back in the car. Tr. 48:17–22.

As Shafer pulled out of the Subway parking lot onto the main road, Detective Canfield observed Shafer fail to use her turn signal and fail to come to a complete stop. Tr. 50: 11–19. Detective Canfield informed officers in marked cars of these traffic violations. Tr. 50:24–51:4. Detective Canfield did not initiate the traffic stop himself "so as not to obviously disclose the involvement of the CI." ECF No. 84 at 3. As Detective Canfield further explained at the hearing, he was an undercover officer in an unmarked vehicle, and therefore he neither had the ability to make the stop nor did he want to reveal himself while undercover. Tr. 52:8–15.

Officer Timothy Clemens received this information and initiated a traffic stop. Tr. 58:7–17. He was able to do so without personally observing the violations because DCSO policy permits an officer to stop a car for traffic violations that he did not observe himself when the information about the violations come from another law enforcement officer. Tr. 58:18–25. Officer Clemens had a dashboard camera in his car that recorded the stop. Officer Clemens approached the driver's side window around minute 1:29 of the video. He asked Shafer for her driver's license, registration, and insurance information, and the passengers for their identification. Tr. 60:20–61:19. Grayon said he did not have identification on him, so Officer Clemens asked for him to write down his name and date of birth. Tr. 61:17–19. Grayon complied, but it was later determined that

3

Grayon wrote down his brother's name and date of birth. Tr. 61:22–23. In addition, Shafer told Officer Clemens that the car was rented and gave him a copy of the rental agreement. Tr. 60:25–61:4.

Officer Clemens returned to his car around minute 3:38. He called in the information he collected from the occupants of the car and confirmed that the car was the one being surveilled by the narcotics unit and that Grayon was the individual whom the narcotics detectives were surveilling. Tr. 61:24–62:6. At minute 9:28, Officer Clemens and Lieutenant Burnette, the other officer with Officer Clemens, began to discuss the fact that the car was rented and none of the occupants' names were on the rental agreement. Lieutenant Burnette advised Officer Clemens to talk to Shafer and find out whether she or any of the other occupants rented the car. He then advised that if no one in the car was on the rental agreement, Officer Clemens should ask Shafer's consent to search the car. Officer Clemens returned to the car around minute 11:20 and asked Shafer to get out of the car. Office Clemens asked for her permission to search the car, which she declined. Tr. 62:7–12. He then told Shafer that because no one in the car was on the rental agreement, no one had an expectation of privacy in the vehicle, and he could search the car. Tr. 62:14–15.

The occupants got out of the car, and the officers searched the vehicle. There was a K-9 on the scene, but there was no sniff conducted around the car because Officer Clemens believed it to be unnecessary given the fact that none of the car's occupants were on the rental agreement. Tr. 63:14–64:2. Lieutenant Burnette found a black bag containing a crystal-like substance in the front passenger area where Grayon had been sitting. At that point, the officers detained Shafer, Grayon, and Cabrera, and Lieutenant

4

Burnette decided to move the stop to a safer location with less traffic. Detective Carpenter arrived at the secondary traffic stop location after dropping the CI off at a safe location. Tr. 17:9–17.

When the search resumed, Officer Clemens found a smaller package of a crystal-like substance in a Subway cup in a cup holder in the back seat and another package of crystal-like substance in the front passenger floor board. The substance was confirmed to be methamphetamine. Subsequent testing confirmed that the officers recovered approximately 198 grams of methamphetamine from the car.

Grayon was indicted on December 13, 2017 for (1) knowingly and intentionally combining, conspiring and agreeing together and having tacit understanding with each other and with others, both known and unknown to the grand jury, to knowingly, intentionally and unlawfully possess with intent to distribute and distribute methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A); all in violation of Title 21, United States Code, Section 846; and (2) knowingly, intentionally and unlawfully possessing with intent to distribute 50 grams or more of methamphetamine and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A). Grayon filed a motion to suppress on November 5, 2018, ECF No. 81. The government responded on November 19, 2018, ECF No. 84, and Grayon replied on January 7, 2019, ECF No. 90. The court held a hearing on the motion on January 17, 2019. The motion is ripe for review.

## II.  DISCUSSION

A passenger of a car may seek to exclude evidence discovered during a traffic stop through two Fourth Amendment principles.  First, he may challenge the seizure of his person while in the car, namely, whether the traffic stop was supported by reasonable suspicion and whether the stop was impermissibly prolonged.  If the traffic stop was not supported by reasonable suspicion or if the stop was impermissibly prolonged, then a passenger is entitled to suppress any evidence discovered from the illegal seizure. Brendlin v. California, 551 U.S. 249, 257 (2007).  Alternatively, a passenger may challenge the search of areas of the car in which the passenger would legitimately expect privacy.  Rakas v. Illinois, 439 U.S. 128, 148 (1978).

Here, Grayon argues that the contraband found in the car should be suppressed due to both an unlawful seizure and an unlawful search.  Specifically, he contends that: (1) the traffic stop was not supported by reasonable suspicion; (2) the traffic stop was improperly prolonged; and (3) pursuant to United States v. Byrd, 138 S.Ct. 1518 (2018), Grayon had a reasonable expectation of privacy in the rental car, even though his name was not on the rental agreement.  The court disagrees and finds that the seizure was lawful because the traffic stop was support by reasonable suspicion due to the observed traffic violations, and the stop was not improperly prolonged.  Moreover, the court finds that even if Grayon had standing to challenge the search, the exclusionary rule does not apply here because at the time of the search, Byrd had not been decided, and the officers relied in good faith on Fourth Circuit law that passengers in a rental car did not have a reasonable expectation of privacy within the rental car.

**A. Seizure of the Car**

The Fourth Amendment's guarantee of the people's right "to be secure in their persons, houses, papers, and effects" protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV. A traffic stop is a "seizure" within the meaning of the Fourth Amendment and must be reasonable under the circumstances. See Delaware v. Prouse, 440 U.S. 648, 653–54 (1979). A passenger in a car may challenge the reasonableness of the stop because "[a] traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver . . . and the police activity that normally amounts to intrusion on privacy and personal security does not [ ] distinguish between passenger and driver." Brendlin, 551 U.S. at 257.

The constitutionality of a traffic stop is assessed under the two-prong standard in Terry v. Ohio, 392 U.S. 1 (1968). First, the articulated basis for the traffic stop must be legitimate. See United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). Second, the officers' actions during the traffic stop must be "reasonably related in scope" to the basis for the seizure. Id. If the basis for the traffic stop is improper or the stop was improperly prolonged, then any contraband seized as a result of the traffic stop is excluded under the "fruit of the poisonous" tree doctrine. Id. Here, the court finds that the stop was reasonable under the circumstances because the basis of the stop was legitimate and not impermissibly extended.

**1. Whether the Basis of the Stop was Legitimate**

There are two potential grounds for the traffic stop here: the traffic violations observed by Detective Canfield and the CI's information. At the time Grayon submitted his motion to suppress, he had not been provided evidence of the traffic violations that

led to the stop; therefore, he simply asserts that the traffic stop was not supported by reasonable suspicion. Based on the cross-examination of Detective Canfield, Grayon suggests that Detective Canfield could not adequately see the alleged violations occur. Tr. 55:20–56:5. As for whether the CI's information provided reasonable suspicion for the traffic stop, Grayon argues that there is insufficient evidence to determine whether the CI was reliable because the government has failed to produce the CI's file.[1]

### a. Violation of Traffic Laws

This first prong of Terry is satisfied "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." See Arizona v. Johnson, 555 U.S. 323, 327 (2009). A "vehicular violation" includes a failure to comply with traffic laws. In Whren v. United States, the Supreme Court held that a traffic stop did not violate the plaintiff's Fourth Amendment rights when the officer had probable cause to believe several vehicle code violations had been committed. 517 U.S. 806, 809–10 (1996). "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." Branch, 537 F.3d at 335; see also United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993) ("When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." (quoting United States v. Cummins, 920 F.2d 498, 500–01 (8th Cir. 1990))). Moreover, "the constitutional reasonableness of traffic stops" does not "depend[] on the actual motivations of the individual officers involved." Whren, 517 U.S. at 813.

---

[1] This issue is the subject of Grayon's motion for Jencks Act material. ECF No. 93.

Here, the government explains that the officers pulled the car over because Shafer failed to use her turn signal and failed to come to a complete stop before entering a roadway, both in violation of South Carolina traffic laws. See S.C. Code Ann. § 56-5-2150(b); id. § 56-5-2330(b). At the hearing, Detective Canfield testified that he observed these violations while the car was leaving the Subway parking lot and turning onto Stallsville Loop. Tr. 50: 14–19. Grayon presented no evidence or testimony to contradict this testimony. Grayon did question whether Detective Canfield could have actually observed the car failing to stop given the location of the detective's car, but Detective Canfield maintained that he observed the violation. Tr. 56:1–5.

It is worth noting that while Detective Canfield observed these violations, he was not the officer who initiated the traffic stop. Rather, he informed Officer Clemens, who was in a marked car, of the violations. Tr. 52:8–15. Officer Clemens then initiated the traffic stop pursuant to DCSO policy that allows an officer to stop a car for traffic violations that were observed by another officer. Tr. 58:18–25. Grayon did not contest the propriety of this practice or the DCSO policy permitting it. As such, the stop was supported by reasonable suspicion.

### b. CI's Information

The government also argues that the information from the CI provided reasonable suspicion for the traffic stop. "[A]uthorities are entitled to stop a moving vehicle reasonably suspected of involvement in smuggling contraband, and they may briefly detain and investigate such a vehicle and its occupants." United States v. Singh, 363 F.3d 347, 349–58 (4th Cir. 2004). The Fourth Circuit has determined that a tip from a known informant that is "substantially corroborated by the developing circumstances" may

9

"establish reasonable suspicion for a vehicle stop." Id. However, because the traffic violations provided sufficient justification for the initial stop, the court need not determine whether the CI's information also provided reasonable suspicion for stopping the car.

### 2. Whether the Stop was Improperly Extended

The second prong of the Terry test asks if the officer took impermissible actions after initiating the traffic stop to unlawfully prolong the stop. "The permissible duration of a traffic stop 'is determined by the seizure's mission—to address the traffic violation that warranted the stop,' meaning that it may 'last no longer than is necessary to effectuate that purpose.'" United States v. Bowman, 884 F.3d 200, 210 (4th Cir. 2018) (quoting Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015)). "An officer may engage in 'ordinary inquiries incident to' the traffic stop, such as inspecting a driver's identification and license to operate a vehicle, verifying the registration of a vehicle and existing insurance coverage, and determining whether the driver is subject to outstanding warrants." United States v. Hill, 852 F.3d 377, 382 (4th Cir. 2017) (quoting Rodriguez, 135 S. Ct. at 1615).

In addition, "[t]he Fourth Amendment permits an officer to conduct an investigation unrelated to the reasons for the traffic stop." Bowman, 884 F.3d at 210 (emphasis in original). This is permissible as long as the officer is "diligently pursing the purpose of the traffic stop" and the investigation "does not prolong the roadside detention for the traffic infraction." Hill, 852 F.3d at 382. For example, during the course of a traffic stop, officers "may question a vehicle's occupants on topics unrelated to the traffic infraction or perform a dog sniff around the outside of a vehicle, as long as the police do

10

not extend an otherwise-completed traffic stop in order to conduct these unrelated investigations." Id.

However, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 135 S. Ct. at 1614. A stop exceeds "the permissible duration and scope of a routine traffic stop" when the officer "fail[s] to diligently pursue the purposes of the stop and embark[s] on a sustained course of investigation into the presence of [contraband] in the car that constitute[s] the bulk of the encounter between the officer and the defendant." United States v. Guijon-Ortiz, 660 F.3d 757, 759 (4th Cir. 2011) (internal quotation marks omitted). A de minimis delay does not violate the Fourth Amendment; rather "the principal inquiry . . . is the officer's diligence—i.e., his persevering or devoted application to accomplish the undertaking of ascertaining whether the suspected traffic violation occurred, and, if necessary, issuing a ticket." Id. (internal quotation marks omitted). "If a police officer wants to detain a driver beyond the scope of a routine traffic stop, [] he must possess a justification for doing so other than the initial traffic violation . . . [and] a prolonged automobile stop requires either the driver's consent or a reasonable suspicion that illegal activity is afoot." United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008).

After a careful review of the dashboard camera footage from Officer Clemens's police car, the court finds that the stop of the car was not impermissibly extended. Officer Clemens pulled the car over and approached the driver's side window around minute 1:27 of the stop. He asked Shafer for her driver's license, registration, and insurance, and the passengers for their identification. Tr. 60:20–61:19. Shafer told

Officer Clemens that the car was rented and gave him a copy of the rental agreement. Tr. 60:25–61:4. Officer Clemens returned to his car around minute 3:38. From minute 4:07–9:15, he called in the information he collected from the occupants of the car and confirmed that the car was the one being surveilled by the narcotics unit and that Grayon was the individual whom the narcotics detectives were surveilling. See also Tr. 61:24–62:6. During this time, it appears that someone texted Officer Clemens a photo of Grayon to confirm that Grayon was in the car, and the officers realized that the name and date of birth that Grayon provided actually belonged Grayon's brother. At minute 9:27, Officer Clemens and Lieutenant Burnette began to discuss the fact that none of the occupants' names were on the rental agreement. From minute 9:48–58, Lieutenant Burnette advised Officer Clemens to talk to Shafer and find out whether she or any of the other occupants rented the car. He then advised that if no one in the car was on the rental agreement, Officer Clemens should ask Shafer's consent to search the car. Their conversation ended around minute 10:39. Officer Clemens returned to the car and asked Shafer to get out of the car. They walked away from the car and began talking around minute 12:00. Officer Clemens asked for her permission to search the car, which she declined. Tr. 62:7–12. At minute 12:47, Officer Clemens told Shafer that because no one in the car was on the rental agreement, no one had an expectation of privacy in the vehicle, and he could search the car. Tr. 62:14–15.

Throughout this period of time, the totality of the circumstances demonstrates that Officer Clemens was diligently pursuing the purpose of the stop. He obtained identification information from the occupants of the car and called in the information over his radio, all of which took about five minutes. This task ended up being slightly

more complicated because Grayon provided the information of his brother instead of his own personal information. Moreover, Officer Clemens's inquiry into whether Grayon was the subject of the narcotics unit's investigation, while unrelated to the traffic stop, did not "measurably extend the duration of the stop." See Rodriguez, 135 S. Ct. at 1615. Officer Clemens was able to confirm that Grayon was the subject within the five minutes he spent running the information of the car's occupants. Officer Clemens then had a brief conversation with Lieutenant Burnette about how to proceed given that the car was rented and none of the occupants were on the rental agreement, which was a de minimis delay in the stop. As such, the stop was not improperly prolonged.

While Officer Clemens's actions may have been motivated in part by the narcotics investigation and not the traffic violations, the Supreme Court has "foreclose[d] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." Whren, 517 U.S. at 813. Whether Officer Clemens has reasonable suspicion or probable cause, based on the CI's information and the narcotics investigation, to go on and conduct the search of the car is an issue separate from whether the stop was impermissibly extended, and as discussed below, is an issue on which Grayon does not have standing to contest. Therefore, the court finds that the stop was not impermissibly extended.

**B. Whether Grayon Has Standing to Challenge the Search**

The court next considers whether Grayon has standing to challenge the search of the rental car. To have standing to challenge a search under the Fourth Amendment, the person searched must have a reasonable expectation of privacy. Rakas v. Illinois, 439 U.S. 128, 143–44 (1978). This person has the burden of establishing that he had a

13

reasonable expectation of privacy. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980). If a person is subjected to search in violation of her Fourth Amendment rights, any evidence found during the search may be excluded through the exclusionary rule. United States v. Stephens, 764 F.3d 327, 335 (4th Cir. 2014).

The Fourth Circuit previously held that a driver of a rental car who is not an authorized driver on the rental agreement does not have a reasonable expectation of privacy in the rental car. United States v. Wellons, 32 F.3d 117, 119–20 (4th Cir. 1994). The Fourth Circuit extended its holding in Wellons to passengers in a rental car in United States v. Rollack and held that a passenger in a rental car who is not listed on the rental agreement has no reasonable expectation of privacy in the rental car. 570 F. App'x 267, 272–73 (4th Cir. 2014). However, the Supreme Court recently announced a new rule abrogating Wellons and held that a driver in lawful possession of a rental car, even when the person is not an authorized driver on the rental agreement, has a reasonable expectation of privacy in the car. Byrd v. United States, 138 S.Ct. 1518, 1524 (May 14, 2018). The government concedes that this holding extends to passengers in a rental car.[2] However, the government argues that the exclusionary rule cannot be applied here to exclude evidence of the contraband because Wellons was still valid law when the traffic stop occurred, as Bryd was decided over seven months after the traffic stop occurred.

---

[2] Despite the government's concession, this is not a settled issue. For example, one district court explained that Byrd does not stand for the proposition that passengers in a rental car have a reasonable expectation to privacy, even when they are not authorized drivers. See United States v. Davis, 326 F. Supp. 3d 702, 718–720 (N.D. Iowa 2018). However, the court need not reach this issue due to the subsequent discussion here about the good-faith exception to the exclusionary rule.

When police officers "act with an objectively 'reasonable good-faith belief'" that their conduct is lawful," courts will not apply the exclusionary rule to exclude evidence that was found as a result of the officers' conduct. Davis v. United States, 564 U.S. 229, 238 (2011). The Supreme Court explained that the purpose of the exclusionary rule is to deter police from purposefully disregarding Fourth Amendment rights, and when police violate a right while acting with objectively reasonable good faith, the deterrence purpose of the exclusionary rule is not served. Id. at 238–39. This "good-faith" exception to the exclusionary rule has been applied when police officers "conduct a search in objectively reasonable reliance on binding judicial precedent." Id. at 239.

For example, in Davis, an officer conducted a traffic stop and subsequently arrested the driver and passenger. Id. at 235. After handcuffing and placing them in the back of a police car, the officers searched the car. Id. At the time, this was constitutionally permissible. See New York v. Belton, 453 U.S. 454, 458–459 (1981). However, two years after the search at issue in Davis and while Davis's appeal was pending before the Eleventh Circuit, the Supreme Court announced a new rule in Arizona v. Gant that police may only search a car incident to the occupant's arrest when the occupant is unsecured and within reaching distance of the car at the time of the search. 556 U.S. 332, 343 (2009). Despite this change in the law, the Supreme Court held that the new rule in Gant did not provide a basis for the exclusion of evidence in Davis because the officer relied on Belton, which was valid law at the time, when conducting the search. Davis, 564 U.S. at 241. The court explained that "[a]n officer who conducts a search in reliance on binding appellate precedent does no more than 'ac[t] as a reasonable officer would and should act' under the circumstances." Id. (quoting United

15

States v. Leon, 468 U.S. 897, 920 (1984)). Therefore, "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." Id. at 242. Indeed, since Byrd was announced, at least one district court in the Fourth Circuit has denied a motion to suppress when the police officers relied on Wellons while conducting a search at a time when Wellons was still binding Fourth Circuit precedent. United States v. Houston, 2019 WL 109393, at *2–3 (W.D.N.C. Jan. 4, 2019), appeal filed, No. 19-4024 (4th Cir. Jan. 11, 2019).

Here, Wellons and Rollack were still Fourth Circuit precedent when the search of the rental car occurred. As such, at the time of the search, none of the occupants of the car had a reasonable expectation of privacy in the car or any bags in the car. See Wellons, 32 F.3d at 119 (holding that if a person has no reasonable expectation of privacy in a rental car, then he also has no reasonable expectation in any luggage he placed in the car). Officer Clemens's testimony indicates that he understood the state of the law on this issue at the time of the search. In the dashboard camera footage at minute 9:28–34, Officer Clemens discussed the fact that none of the occupants were on the car's rental agreement with Lieutenant Burnette. He testified that at the time of the search, his understanding of the law, which he referred to as the "third party rental law" was that "if the driver or the occupants of the vehicle are not on the rental agreement, it does not allow them any rights to refuse a search of the vehicle." Tr. 62:14–63:3. Officer Clemens explains that he knew this to be the law from his training. Tr. 63:11–13. Moreover, Officer Clemens communicated this understanding of the law with Shafer, because when he was conducting the stop, he advised Shafer of the "third party rental

16

law." Tr. 62:14–63:3. Therefore, Officer Clemens acted in good faith when he searched the car, and the exclusionary rule cannot apply here.

### III. CONCLUSION

For the reasons set forth above, the court **DENIES** the motion.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 29, 2019**
**Charleston, South Carolina**